IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 12, 2017 Session

**STATE OF TENNESSEE v. LAMANTEZ DESHA ROBINSON**

**Appeal from the Criminal Court for Davidson County
No. 2014-B-1383    J. Randall Wyatt, Jr., Judge**

_____

**No. M2016-02335-CCA-R3-CD**

_____

Lamantez Desha Robinson ("the Defendant") was convicted by a Davidson County jury of attempted second degree murder and sentenced to twelve years' incarceration. In this direct appeal, the Defendant contends that the trial court erred in admitting into evidence a Facebook photograph of the Defendant posing with two handguns and that the evidence submitted at trial was insufficient to support his conviction. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Lamantez Desha Robinson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn Funk, District Attorney General; and Amy Hunter and Addie Askew, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

*Pretrial Motion Hearing*

Prior to trial, the Defendant filed a Motion to Exclude Photograph, arguing that a photograph of the Defendant holding two handguns, which the State intended to admit at trial, was irrelevant, that it could not be authenticated, and that the prejudicial effect far

outweighed its probative value. He further argued that the photograph was propensity evidence meant to demonstrate that the Defendant was "a violent person" with the "propensity to commit these kinds of offenses." The State argued that the evidence was not offered as propensity evidence but to establish the Defendant's identity as the shooter.

At a hearing on the motion, the trial court heard evidence that the photograph was taken from the Defendant's Facebook page at www.facebook.com/Lamantez.Robinson. The State established that the photograph of the Defendant was posted to his Facebook page two and a half months before the offense in this case was committed; however, the State could not establish the date on which the photograph was taken or who posted the photograph to Facebook. The trial court took the motion under advisement and later entered a thorough written order denying the Motion to Exclude Photograph.

In its order denying the Motion to Exclude Photograph, the trial court found:

> This cause came to be heard on May 20, 2016, on the Defendant's motion to exclude a photograph of the Defendant that the State pulled from his Facebook page. The Defendant is charged in this case with attempted second degree murder. The date of the alleged offense was August 30, 2013. The Defendant was subsequently arrested at a house on September 27, 2013. At the house where the Defendant was arrested, law enforcement officers found three pistols outside in a grill, including a Glock pistol that was later confirmed to be the pistol used in the alleged offense through ballistics testing. Prior to this trial, the State discovered that . . . a photograph was posted to the Defendant's Facebook page on June 13, 2013. The photograph shows an individual who appears to be the Defendant holding a pistol in each hand. Based on the State's motion, the Court is given to understand that Special Agent Kevin Warner, who conducted the ballistics test, would testify at trial that the pistol in the Defendant's right hand was "consistent with a Glock." The State seeks to use the photograph to show that the gun found in the grill at the house where the Defendant was arrested was actually the Defendant's gun. The Defendant argued that the photograph should be excluded on three grounds:
>
> 1. The photograph is irrelevant to the trial;
>
> 2. The photograph cannot be properly authenticated; and
>
> 3. The prejudicial effect substantially outweighs the probative value of the photograph.

- 2 -

With respect to relevance, the trial court found that "if the photograph [was] of the Defendant and [was] of a real gun, the evidence [was] relevant, regardless of when it was taken." The court stated, "The Defendant being in a possession of a firearm that looks like the firearm he was found with tends to make it more likely that that was actually his firearm, and thus, that he was involved in the incident." Accordingly, the trial court determined that the photograph was relevant.

As to authentication, the trial court reasoned:

> [I]n order for the photograph in question to be properly authenticated, the Court must be satisfied that there is sufficient evidence to support a finding by the trier of fact that the matter in question is what the State claims.

> In light of this, the pertinent question is what the State claims the photograph to be. It is the Court's understanding that the State is claiming that the photograph is the Defendant holding a pistol similar to the Glock which was found in the grill at the home where the Defendant was arrested. The evidence the Court believes the State would offer in support of this contention is Detective [Jeremy] Smith's testimony that the individual in the photograph appears to be the Defendant and [] Agent Warner's testimony that the pistol in the individual's "right hand is consistent with a Glock." While the Court is not certain that this actually is what the photograph is, the Court does believe that this evidence is sufficient to support a finding by the jury that the photograph is what the State claims it is. Accordingly, the Court is of the opinion that the authentication requirement is met.

With respect to the danger of unfair prejudice, the trial court first determined that the issue should be analyzed under Rule 403 rather than Rule 404(b). The trial court noted that the Tennessee Supreme Court had held previously that possession of a weapon is not a crime or bad act, and thus does not implicate Rule 404(b), citing *State v. Reid*, 213 S.W.3d 792, 813-14 (Tenn. 2006). The trial court then concluded that, under Rule 403, the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice to the Defendant. The court noted that it was "sensitive to the fact that admitting this photograph carries some danger of unfair prejudice to the Defendant[.]" However, the trial court reasoned that the identity of the perpetrator was the sole issue at trial and that the photograph tended to make it more likely that the Defendant was in possession of the weapon used to shoot the victim. Accordingly, the trial court determined that the photograph was admissible.

- 3 -

Keneuk Helton ("the victim") testified that he worked as a railroad engineer on a train that ran from Evansville, Indiana, to Nashville, a trip that took twelve hours. The victim explained that, upon reaching Nashville, he would stay in a hotel for the night and make the return trip to Evansville the next day. He recalled that he arrived in Nashville on August 30, 2013, and stayed at La Quinta Inn and Suites in Donelson that night. While there, the victim changed the oil in his truck and then took his truck to Shine On Auto Wash on Elm Hill Pike around 10:00 p.m. When he arrived at the car wash, the victim pulled into a car wash bay, stepped out of his truck, and noticed two black men he had never seen before approaching him from a parking lot next door. No one else was at the car wash. One of the men walked through an adjacent car wash bay and then passed in front of the victim's truck about ten to twelve feet away from the victim. The man asked the victim, "How are you doing, sir?" and continued to walk into the next bay. The victim testified that lights were on in the car wash bays, and he was able to clearly see the man's face. He confirmed that there was nothing that prevented him from "getting a look at" the man's face.

A few seconds later, the same man approached the victim with a gun drawn. The man had on a black "neoprene type mask" or t-shirt covering his face up to his nose. The man pointed the gun at the victim and told him "not to move." The victim testified that he knew it was the same man who had just spoken to him because the man was wearing the same clothing and had the same hairstyle. The man stood about six feet from the victim, near the front of the truck and directly in front of the victim. The victim noticed that the second man was standing at the back of the car wash bay with a blue bandana over his face. The victim, who was standing behind the open driver's side door, reached into the cab of his truck with one hand and retrieved his handgun.[1] Because he was afraid the man would see the gun, the victim kept it "tucked behind [his] leg[.]" The victim heard two gunshots and felt himself "being twisted . . . around[.]" He then realized that he had been shot and that he had fallen to the ground in the car wash bay. He stated that he had five dollars' worth of quarters sitting on top of the car wash machine and that he did not know if the Defendant or his accomplice took anything from the scene before they fled. The victim was able to stand up, retrieve his cell phone, and call 911. The victim walked out into the parking lot towards some vacuum cleaners to try to "wave traffic down[.]" A car pulled into the parking lot, and two people got out of the car to help the victim. The victim gave his gun to one of these people before the police and ambulance arrived. The victim testified that he spent two weeks in the hospital. He had been shot through the back of his arm and under his armpit. He suffered a collapsed

---

[1] The victim testified that he had a concealed carry permit for the handgun.

lung, which had to be "re-inflated" twice, and the complete loss of his hearing in the left ear.

On March 15, 2014, Detective Jeremy Smith of the Metro-Nashville Police Department (MNPD) prepared a photographic lineup for the victim to view, which contained the Defendant's photograph. The victim circled the Defendant's photograph and stated that he was the shooter. The victim testified that he took the lineup seriously and looked at each photograph carefully and stated that it took about forty-five minutes for him to make the identification. He explained that it took him forty-five minutes because he could not decide between the Defendant's photograph and one other. When the victim told Detective Smith that he was "sure" about the identification, Detective Smith told him that the Defendant had been arrested. At trial, the victim again identified the Defendant as the man who shot him. He testified that he was able to "get a good view" of the Defendant and that he was "absolutely positive" that the man with the gun was the Defendant.

Officer Bradley Bracey, a K-9 officer with the MNPD, testified that he responded to the shooting call at the car wash on Elm Hill Pike. Officer Bracey was provided a description of the suspects and was told which direction the suspects ran. Officer Bracey and the K-9 "tracked" the suspects down the sidewalk of Elm Hill Pike towards a hotel, about a block away from the car wash. However, the K-9 "lost what [it] was tracking from the scene." Officer Bracey testified that it appeared that the suspects ran towards the hotel but then got into a vehicle.

Officer Lynsie Smith with the MNPD testified that she also responded to the scene of the shooting on August 30, 2013. Upon arrival, Officer Smith saw the victim lying on the ground in front of the car wash. The victim was bleeding from his shoulder and chest and was having trouble breathing. Officer Smith attempted to control the victim's bleeding before paramedics arrived, and she asked the victim for a description of the suspect. The victim said that the suspects were two black males and that they fled down Elm Hill Pike towards Briley Parkway. The victim told Officer Smith that a passerby had stopped at the scene and taken his gun. Officer Smith testified that she viewed the scene after the victim was loaded into an ambulance. She saw blood on the ground inside the car wash bay by the victim's truck. She noted that the window to the driver's door had been "shot out," and there was "glass all over the floor" of the car wash bay.

Sergeant Johnny Crumby and Officer Steven Heimback of the MNPD testified that, as part of the investigation, they went to a residence on Merry Oaks Drive around 10:30 p.m. on the night of the shooting. There, they spoke to two witnesses, John Sanders and Joli Overstreet, who turned over the victim's handgun. Mr. Sanders and Ms. Overstreet stated that they were at an Arby's restaurant near the Shine On Auto Wash

- 5 -

when they heard gunshots coming from the location of the car wash. Mr. Sanders and Ms. Overstreet pulled into the parking lot of the car wash where they saw the victim. They noticed a gun lying on the ground, and for safety reasons, they picked up the gun and put it into the trunk of their car. Mr. Sanders and Ms. Overstreet explained that they had two small children with them, who were frightened and upset, so they left the scene and went to their residence. They called 911 and advised officers that they had the victim's gun.

Investigator Douglas Felter, with the MNPD Crime Scene Investigation Section, testified that he collected two cartridge casings and a holster from the car wash bay. He testified that he found "defects" in the driver's side window of the victim's truck caused by two apparent bullet strikes. Investigator Felter testified that one of the defects showed a "left to right directionality," meaning that, when the bullet struck the surface of the window, it was "coming from the left-hand side going towards the right[.]" He stated that this was consistent with someone standing in front of the left side of the victim's vehicle and firing at the vehicle.

John Sanders and Joli Overstreet testified that, on August 30, 2013, they were at the drive-thru at Arby's on Elm Hill Pike when they heard four to five gunshots. As they left Arby's, Ms. Overstreet saw a man lying in the entryway of the car wash "kind of waving." Ms. Overstreet thought that someone had been shot and pulled their car into the parking lot of Shine On Auto Wash where they found the victim lying on the ground. They both got out of the car and approached the victim, who had been shot multiple times. Mr. Sanders called 911, and Ms. Overstreet applied pressure to the victim's wounds. Mr. Sanders and Ms. Overstreet had two children in their car, so they decided to leave the scene. Ms. Overstreet explained that, as a safety precaution, Mr. Sanders picked up the victim's gun and took it to their residence where they again called 911 to let police know that they had picked up a gun at the scene. Within five minutes, officers arrived at their home on Merry Oaks Drive, and they turned over the gun.

MNPD Detective Brian Harris testified that, on September 27, 2013, he was working on the Flex Team within the department. In that capacity, Detective Harris went to a residence on 9th Avenue North around 8:00 p.m., after receiving information that a gang member who had outstanding warrants, Karl Archibald, was inside the residence. Detective Harris explained that the residence was located in the "Cheatham Homes projects" and that Mr. Archibald was a member of the Rollin' 40 Crips. Upon arrival, several individuals ran inside the residence. Detective Harris verified through bystanders that Mr. Archibald was inside the residence, so officers surrounded the home and waited. Officers knocked and announced themselves, trying to get Mr. Archibald to come to the door. Officers used a PA system to address Mr. Archibald, and Mr. Archibald's mother tried to talk him out of the residence. However, no one inside the residence would

answer the door. After three hours with no response, officers obtained a search warrant for the residence. Detective Harris announced over the PA system that officers had a search warrant, and they were going to enter the residence. As officers were getting ready to go in through the front door, multiple individuals, including Mr. Archibald and the Defendant, exited the residence. During the execution of the search warrant, officers found three handguns located inside a covered grill that sat on the front porch. Detective Harris testified that the grill was in the front of the home and was close enough to the house that "[y]ou could have touched the grill while standing inside the doorway." On cross-examination, Detective Harris acknowledged that the grill was accessible to anyone walking by the residence and that weapons charges were eventually dismissed against the individuals inside the residence because it could not be established who possessed the weapons.

Detective Jeremy Smith with the MNPD testified that he investigated the victim's shooting and that he initially responded to Vanderbilt Hospital to try to speak to the victim. While the victim was being treated by medical staff, he spoke with Detective Smith. The victim stated that he went to the car wash to wash his truck, and two black men pulled into one of the bays. They then "split up," and one of the men walked past the front of the victim's truck. The man said something to the victim "to the effect of how you doing." The victim reached into his truck and retrieved his handgun. When he got out of his truck, the man walked back in front of the truck and had a blue bandana over his face. The man told the victim, "[D]on't move." He then shot the victim, and the victim fell to the ground. The victim provided a description of the shooter as a black man with dreadlocks, wearing dark blue running pants, a dark shirt, and a blue bandana over his face. The victim estimated that the man was in his "early 20s" and over six feet tall. The victim told Detective Smith hat he was unable to see the face of the second man at the back of his truck.

At the car wash, Detective Smith noted that there were lights on inside each of the bays. The driver's side door of the victim's truck was open, and there were two cartridge casings on the ground. Detective Smith stated that one round went through the driver's side door window. Detective Smith later collected projectiles that had been removed from the victim during surgery, and he sent the projectiles and the cartridge casings from the crime scene to the Tennessee Bureau of Investigation (TBI) crime lab for analysis.

Detective Smith explained that, in February 2014, he learned that the TBI linked the two cartridge casings from the car wash to a .9mm Glock 17, which had been recovered during the execution of the search warrant on the 9th Avenue North residence. Detective Smith testified that, out of all the individuals found at the 9th Avenue North residence at the time of the search warrant, only the Defendant matched the physical

description given by the victim of the shooter.[2] Detective Smith created a photographic lineup for the victim to view, which contained the Defendant's photograph. Detective Smith stated that it took the victim six or seven minutes to pick out the Defendant from the lineup. The victim identified the Defendant, and said, "[T]hat's him. That's the shooter." The victim stated that he was "100 percent sure" of his identification. Detective Smith stated that it did not take the victim forty-five minutes; he noted that he would not have let the selection process continue for forty-five minutes.

Detective Smith testified that he searched for the Defendant on Facebook. Detective Smith stated that, on the Defendant's Facebook page, there were multiple photographs of the Defendant. One photograph, which was posted on June 13, 2013, showed the Defendant holding up two handguns, one in each hand. The photograph was titled, "How could you not know, two guns up." Detective Smith testified that he did not know when the photograph was taken or who took the photograph. Detective Smith stated that the gun in the Defendant's right hand appeared similar to a Glock pistol. The photograph was introduced into evidence as an exhibit.

The trial court then instructed the jury:

> You have just seen a . . . photograph of the [D]efendant holding two objects that could be guns and you have testimony regarding that photograph. The State has offered this evidence in its effort to prove the identity of the [D]efendant as the individual who committed the crime with which he is charged in this case.

> Possession of a firearm or multiple firearms is neither a crime nor a bad act, accordingly, the photograph and the testimony regarding it, if considered by you for any purpose should only be considered for the purpose of determining whether the Defendant is the individual who committed the offense with which he is now on trial.

> In other words, it goes to the State's argument regarding identification . . . .

On cross-examination, Detective Smith testified that, on the night of the offense, the victim said that the shooter had on a black ski mask. However, in a follow-up interview, the victim said that the shooter had on a bandana, and the man to the rear of his truck had on a black ski mask. Detective Smith agreed that, after the victim identified the

---

[2] Detective Harris testified that the Defendant was the only individual at the residence that had dreadlocks.

Defendant in the photographic lineup, he told the victim that the Defendant had been found at the residence where the gun used in the shooting had been found. He did not recall the victim saying that the suspect in the shooting wore a blue hoodie.

Special Agent Kevin Warner, a forensic scientist with the TBI crime lab and expert in firearm and tool-mark identification, testified that he received the .9mm Glock 17 found at the 9th Avenue North residence, as well as the two cartridge casings discovered at the car wash. He test-fired the pistol and compared the two cartridge cases to the cases produced by the test-firing. Agent Warner determined that the two cartridge cases collected at the car wash had been fired from the .9mm Glock 17. Additionally, Agent Warner testified that the weapon was visually consistent with the handgun held by the Defendant in his right hand in the photograph. Agent Warner explained that his conclusion was based on the size and the physical characteristics of the gun, including the shape of the trigger guard, the shape of the frame, the bottom of the grip, and the "butt plate of the magazine."

On cross-examination, Agent Warner stated that he could not tell if the pistol held by the Defendant in the photograph was the same .9mm Glock 17 used in the offense. Additionally, Agent Warner stated that he could not testify with certainty that the gun held by the Defendant was a "real functional gun[.]" Agent Warner estimated that there were "well over a million" Glock 17 pistols in existence.

Dr. Jeffrey Neuschatz, a cognitive psychologist, testified as an expert in eyewitness identification. Dr. Neuschatz reviewed the police reports, line-up reports, and transcripts of prior hearings in the case. He stated that the victim's ability to identify the perpetrator could have been affected because he was under a "high stress situation" when he was shot. He further stated that, because the victim was white and the Defendant was black, the victim's identification was a "cross-race identification," which could make proper identification more difficult. On cross-examination, Dr. Neuschatz stated that he could not say whether the victim's identification was accurate or not. He explained that he had no opinion as to whether the victim was able to make an accurate identification of the Defendant; his testimony simply concerned the various factors that could affect eyewitness identification. He stated that he had no expert opinion about whether "weapon focus" or "cross-rac[ial] bias" had any bearing on the victim's identification of the Defendant.

Jessica Van Dyke testified on behalf of the Defendant about Facebook. Regarding photographs posted to a Facebook page, Ms. Van Dyke testified that "it won't say when the picture was taken or . . . how it came into existence, it only says when it was posted on Facebook on that specific timeline." She stated that the photograph appeared to have

been posted on the Defendant's Facebook page on June 13, 2013, but she could not identify who posted the photograph.

Following deliberations, the jury found the Defendant guilty of attempted second degree murder. At a sentencing hearing, the trial court sentenced the Defendant, as a Standard Range I offender, to twelve years' incarceration. The Defendant filed a timely Motion for New Trial and Amended Motion for New Trial, which the trial court denied after a hearing. This timely appeal follows.

## II. Analysis

### Admission of Photograph

The Defendant contends that the trial court erred when it admitted into evidence the Facebook photograph of the Defendant posing with two handguns. Essentially, the Defendant asserts that, although the State argued at trial that the photograph was relevant to the identity of the Defendant as the shooter, its true purpose was to show the Defendant's propensity for violence. In his brief, the Defendant argues that:

> [t]he picture does nothing to resolve the identity question but merely casts the [Defendant], in the minds of the jury, as a person who is comfortable handling handguns whom they had already heard hung out with gang members in the projects, one of whom, the police had to threaten with a search warrant to get him to come out and surrender on a different arrest warrant.

The State responds that the trial court properly admitted the photograph, arguing that it was highly probative because it showed that the Defendant had access to, or owned, the gun used to shoot the victim and that the probative value outweighed any unfair prejudice to the Defendant. We agree with the State.

In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. *State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005); *see also* Tenn. R. Evid. 402. "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000)); *see also* Tenn. R. Evid. 401. However, Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "'[a]n undue tendency to suggest decision on

an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Advisory Committee Note to Federal Rule of Evidence 403). Generally, this court reviews a trial court's decision to admit evidence based upon its relevancy under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible "when the prior conduct is relevant to an issue other than the accused's character, such as identity, motive, common scheme or plan, intent, or absence of mistake." *State v. Adams*, 405 S.W.3d 641, 659 (Tenn. 2013); *see also State v. Gilliland*, 22 S.W.3d 266, 271 n.6 (Tenn. 2000). Our supreme court has interpreted Rule 404(b) to apply only to "bad acts." *State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014). Accordingly, testimony about behavior which is relevant and which does not constitute a crime or bad act is not analyzed under Rule 404(b). *Reid*, 213 S.W.3d at 814. Possession of a handgun is not a "bad act" requiring the application of the Rule 404(b). *Id.*

We agree with the trial court's conclusion that the photograph introduced into evidence showing the Defendant's holding two handguns does not constitute evidence of a prior bad act as contemplated by Rule 404(b).[3] *See id.* Accordingly, the trial court properly reviewed the issue under the standard set forth in Rule 403. In concluding that the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice, the trial court reasoned that the identity of the perpetrator was the sole issue at trial and that the photograph tended to make it more likely that the Defendant was in possession of the weapon used to shoot the victim. The record supports this conclusion.

At trial, the State presented evidence that the victim was shot with a .9mm Glock 17 pistol on August 30, 2013, and that the weapon used in the shooting was found less than a month later at the 9th Avenue North residence where the Defendant was present. Detective Harris testified that some of the occupants of the 9th Avenue North residence, including the Defendant, had been charged with possession of one of the guns, but the charges were dismissed because a connection to the gun could not be established.

---

[3] Although the Defendant attacks the admissibility of the photograph in the context of the Defendant's association with gang activity and the location of the 9th Avenue North residence, he made no effort to exclude evidence of his connection to Mr. Archibald and the location of the residence at trial. The Defendant could have objected to the introduction of this testimony but failed to do so; accordingly, these issues, if properly raised on appeal, would be considered waived. *See* Tenn. R. Evid. 103(a)(1) (stating that "[e]rror may not be predicated upon a ruling which admits evidence . . . unless a substantial right of the party is affected, and . . . a timely objection or motion to strike" is made).

However, prior to the Defendant's trial, the State discovered a photograph posted to the Defendant's Facebook page on June 13, 2013, which showed the Defendant holding a pistol in each hand. The State's firearm identification expert, Agent Warner, testified that the weapon used in the shooting was visually consistent with the handgun held by the Defendant in his right hand in the photograph. Agent Warner explained that his conclusion was based on the size of the gun and the physical characteristics, including the shape of the trigger guard, the shape of the frame, the bottom of the grip, and the "butt plate of the magazine." Based on this testimony, the photograph was clearly probative as it tended to connect the Defendant to the handgun used in the shooting and, thereby, to support the victim's identification of the Defendant as the shooter. The trial court did not abuse its discretion by admitting the photograph into evidence.

### Sufficiency of the Evidence

The Defendant argues that "[t]he evidence was insufficient as a matter of law for any reasonable trier of fact to find the [Defendant] guilty beyond a reasonable doubt." Specifically, he contends that the evidence was insufficient to establish his identity as the man who shot the victim. The State responds that the evidence was sufficient to support the jury's finding that the Defendant was the perpetrator. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact-finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial

evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Koffman*, 207 S.W.3d 309, 322 (Tenn. Crim. App. 2006) (citing *State v. Radley*, 29 S.W.3d 532, 536 (Tenn. Crim. App. 1999)).

> The reliability of an in-court identification depends on the totality of the circumstances, "including the opportunity of the witness to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the prior description of the offender, the level of certainty of the witness at the confrontation, and the length of time between the crime, and the confrontation."

*Id.* (quoting *State v. Beal*, 614 S.W.2d 77, 82 (Tenn. Crim. App. 1981)).

In this case, the victim identified the Defendant in a photographic lineup and at trial as the man who shot him. The victim testified that the car wash bay was well-lit, and he could see the Defendant's face clearly as the Defendant walked past the front of the truck and spoke to him. Although the Defendant's face was partially covered when he approached the victim the second time, the victim stated that he knew it was the same person based on the man's clothing and hairstyle. Following the shooting, the victim provided investigators with a physical description of the shooter, which matched the Defendant. The victim testified that he was 100 percent sure of his identification. Because the victim viewed the Defendant under such circumstances that would permit a positive identification to be made, the victim's testimony alone would be sufficient, if credited by the jury, to support the Defendant's conviction. *See Koffman*, 207 S.W.3d at 322.

The State, however, presented additional circumstantial evidence to support the victim's identification. The jury heard evidence that, less than a month after the shooting, police found the Defendant at a residence where the .9mm Glock 17 pistol used in the shooting was located. The State then introduced a photograph of the Defendant holding a gun that was visibly consistent with that handgun. When viewed in the light most favorable to the State, the evidence is sufficient for any rational trier of fact to find that the Defendant was the perpetrator of the offense beyond a reasonable doubt. The Defendant is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE